704 So.2d 844 (1997)
Steve DOUGLASS, Individually and on Behalf of his minor child, Annie Marie Douglass, et als.
v.
ALTON OCHSNER MEDICAL FOUNDATION, et als.
Nos. 96-C-777, 97-CA-25.
Court of Appeal of Louisiana, Fifth Circuit.
December 10, 1997.
*845 Thomas W. Mull, Covington, and Carl Duhon, Lafayette, for Plaintiffs/Appellants.
Charles F. Gay, Jr., E. Paige Sensenbrenner, Robert Markle, New Orleans, for Defendant/Appellee Alton Ochsner Medical Foundation.
Before WICKER, CANNELLA and DALEY, JJ.
DALEY, Judge.
This is an appeal taken by the plaintiffs from the granting of a partial summary judgment in favor of the defendant, Alton Ochsner Medical Foundation, with regards to plaintiffs' claims of breach of implied warranty of merchantability and strict liability.

FACTS AND PROCEDURAL HISTORY
The plaintiffs' minor daughter, Annie Marie Douglass, underwent surgery to correct a congenital heart defect on January 24, 1983. During the surgery and recovery period, she received several units of blood and blood products. She fully recovered from the surgery and has had no related heart problems or symptoms since the surgery.
In March 1993, Annie Marie was diagnosed as positive for HIV. Her parents, individually and on her behalf, and on behalf of her siblings, instituted this suit against the surgeon, Dr. John Ochsner, Alton Ochsner Medical Foundation (Ochsner), the referring cardiologist, Dr. Terry King, and the American Association of Blood Banks (AABB) alleging various theories of liability.
A number of motions for summary judgment were filed by the defendants. Dr. King moved for and was granted partial summary judgment on plaintiff's allegations that he had a duty to warn them of the risks associated with the pending surgery, claiming that as a referring physician he had no duty to warn. AABB moved for and was granted summary judgment arguing that they owed no duty to plaintiffs under Louisiana law, based on the fact that AABB has no regulatory powers over member blood banks. The grants of summary judgment were appealed and this Court affirmed the summary judgment in favor of Dr. King and reversed the summary judgment in favor of AABB. Douglass v. Alton Ochsner Medical Foundation, 97-25 (La.App. 5th Cir. 5/28/97), 696 So.2d 136.
Ochsner moved for and was granted partial summary judgment dismissing plaintiff's claims of strict liability and breach of implied warranty of merchantability. The plaintiffs applied for Supervisory Writs to this Court against the granting of summary judgment in favor of Ochsner.[1] This Court denied the application. The plaintiffs applied to the Supreme Court, which granted the writ application. The Supreme Court held that the proper vehicle for seeking review of the granting of a partial summary judgment is by way of appeal[2]. The case was remanded *846 to this Court to docket as an appeal. Douglass v. Alton Ochsner Medical Foundation, 96-2825 (La.6/13/97), 695 So.2d 953.
The present appeal originated from the granting of a partial summary judgment in favor of Alton Ochsner Medical Foundation dismissing claims asserted in the following paragraphs of plaintiffs' petition:
XII.
Defendant Ochsner Foundation Hospital breached an implied warranties of fitness and merchantability by selling and/or distributing a product that was defective and unreasonably dangerous for normal use in that the blood and/or blood products received by Annie Marie Douglass was contaminated with HIV.
XIII.
Defendant Ochsner Foundation Hospital is strictly liable under La. C.C. Art 2317 and all other applicable La. Laws as a producer or distributer of a product defective by reason of its hazard to normal use, the defendants being presumed to know the vices in the thing they produce and/or distribute, whether or not they had knowledge thereof.
In support of their motion, Ochsner cited LSA-R.S. 9:2797, the so called "blood shield statute" enacted in 1981, which was in effect at the time of Annie Marie's surgery. The statute at that time read, in pertinent part:
Strict liability or liability of any kind without negligence shall not be applicable to physicians ... hospitals, hospital blood banks ... in the screening, processing, transfusion, or medical use of human blood and blood components of any kind ... which results in the transmission of viral diseases ... undetectable by appropriate medical and scientific laboratory tests. LSA-R.S. 9:2797.
Attached to the memorandum in support of their motion was an affidavit by Dr. Shannon Cooper, the director of the blood bank at Ochsner Hospital, which states that there were no tests available in January 1983 that could detect HIV and that HIV was not identified until April 1984. The first test for HIV became available in March 1985.
In response, the plaintiffs strongly contend that there were five tests available in January 1983 that could detect HIV. They argue that there are questions as to the definition of "undetectable" and "appropriate medical and scientific laboratory tests" as used in the statute, creating material issues of fact that necessitate the denial of the motion. In support of their opposition to the motion, they attached excerpts from the deposition of Dr. Don Francis and an affidavit executed by Dr. Theodore Koerner. Dr. Francis listed five tests that were available in January 1983, which could identify at least eighty percent of the individuals at risk for developing AIDS. Of these five, the Hepatitis B core antigen test is the test he opines should have been used by blood banks in January 1983 to screen donors at risk for developing AIDS. Dr. Koerner's affidavit lists the same five tests that were available in 1983 and he claims these tests could predict the presence of HIV.
The trial judge granted the summary judgment, finding that there was no test available in January 1983 to identify HIV. In her oral reasons for judgment, she relied on LeBlanc v. Meza, 620 So.2d 521 (La.App. 3 Cir.1993), which held that a patient infected with HIV following a blood transfusion did not have an action in strict liability against the hospital pursuant to LSA-R.S. 9:2797.
On appeal, plaintiffs reassert their arguments presented in the trial court, contending LSA-R.S. 9:2797 does not apply because carriers of HIV were detectable before January 1983. Plaintiffs suggest there is a disagreement among the experts as the meaning of "undetectable." They also argue that the purpose of the statute was to limit, rather than bar, liability for breaches of implied warranty and strict liability and that the legislature struck a balance in enacting this statute by allowing liability to attach when diseases were detectable. They support their contention that the action in strict liability against Ochsner is not barred by R.S. 9:2797 by referring to the deposition of Dr. Francis. Dr. Francis explained that the Hepatitis B core antigen test would detect *847 whether or not a person was at risk for AIDS because the AIDS virus was present in the same population as those diseased with Hepatitis B. Dr. Francis stated that by July 1982, the medical community was aware that HIV was capable of being transmitted by blood. It was also known that male homosexuals and intravenous drug users were at highest risk for developing the disease. He testified that eighty percent of male homosexuals and intravenous drug users have had Hepatitis B at sometime. He concluded that by testing for the Hepatitis B core antibody individuals who were at high risk for carrying HIV could be detected.
Plaintiffs also argue that there is still no test available that identifies HIV. The ELISA test, which became available in March 1985, only detects antibodies to HIV and not the virus itself. They suggest that based on this, even though the tests available in January 1983 did not identify the virus itself, they were still appropriate because the test presently used does not identify the virus.
In support of their position, plaintiffs also cite the deposition testimony of Dr. Cooper wherein he acknowledged that the Hepatitis B core antigen test identifies ninety-five percent of Hepatitis B carriers. The risk group for Hepatitis B was intravenous drug users and male homosexuals  the same risk group for developing AIDS.
Plaintiffs urge this Court to follow the holding in Branch v. Willis-Knighton Medical Center, 92-3086 (La.4/28/94), 636 So.2d 211, which allowed an action in strict tort products liability against a hospital by a plaintiff who contracted hepatitis from a blood transfusion.
In response, Ochsner argues that the tests cited by the plaintiffs' experts do not detect HIV or HIV antibodies; rather, they may have identified people who have high risk behavior for HIV. Defendants refer to the affidavit of Dr. Cooper, which states that in January 1983, there were no medical or scientific laboratory tests in existence that could detect the presence of HIV; HIV was not identified until April of 1984; and the first time a medical or scientific laboratory test was made available to the medical community that could detect HIV was in March of 1985.
Ochsner cites the testimony of the plaintiffs' expert, Dr. Koerner, who defined surrogate tests as those identifying people at risk for a disease by testing for some symptom or characteristic manifested by a majority of people who have contracted or who are at risk for contracting the disease. Defendants contend these tests could have predicted whether an individual was a member of a group known to be at risk for developing HIV; however, none of these tests that plaintiffs claim should have been used could actually detect HIV or HIV antibodies.
The defendant also points out that at the time the cause of action arose in Branch, supra, LSA-R.S. 9:2797 had not been enacted. Defendant suggests that the Supreme Court's holding in DeBattista v. Argonaut-Southwest Insurance Company, 403 So.2d 26 (La.1981) is what prompted the legislature to enact R.S. 9:2797 and that the obvious intention of the statute was to limit the instances in which hospitals, doctors, and certain others would be subject to strict liability or breach of warranty claims for the transfusion of blood that results in the transmission of viral diseases. They concede that if a viral agent was capable of being discovered in the blood by means of an appropriate medical or scientific laboratory test, then strict liability claims could be brought against those involved in the transfusion. They contend that there has been no expert testimony presented in this case that has revealed that a test to detect HIV was available in January 1983; therefore, there is no genuine issue of material fact presented in this case and the trial court was correct in concluding the defendant was entitled to judgment as a matter of law.

ANALYSIS
Louisiana Code of Civil Procedure Article 966 provides, in pertinent part, that a motion for summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that mover is entitled to judgment as a matter *848 of law. In 1996, the legislature added the following subsections:
The summary judgment procedure is designed to secure the just, speedy and inexpensive determination of every action, except those disallowed by Article 969. The procedure is favored and shall be construed to accomplish these ends. LSA-C.C.P. art. 966A(2).
After adequate discovery or after a case is set for trial, a motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted against an adverse party who fails to make a showing sufficient to establish the existence of proof of an element essential to his claim, action, or defense and on which he will bear the burden of proof at trial. LSA-C.C.P. art. 966C.
It is well settled in our jurisprudence that appellate courts review summary judgments de novo, using same criteria applied by trial courts to determine whether summary judgment is appropriate. Rapp v. City of New Orleans, 95-1638 (La.App. 4th Cir. 9/18/96), 681 So.2d 433; La. C.C.P. Art. 966 B.
The plaintiffs urge that there is a material issue of fact as to the definition of the word "undetectable" as used in LSA-R.S. 9:2797. They refer the Court to the section of the Civil Code for guidance in construction of law. Civil Code Article 11 provides:
The words of the law must be given their generally prevailing meaning.
The word "undetectable" is not found in Merriam Webster's Dictionary, however, the word "detect" is defined as "1: to discover the true character of; 2: to discover or determine the existence, presence or fact of (detect alcohol in the blood)." The prefix "un" is defined in Webster's as: "1: do the opposite of: reverse (a specified action)." Using these guide lines we find "undetectable" as used in the statute means "to be not able to discover or determine the existence of."
The plaintiffs urge that the surrogate tests that they contend should have been used to identify individuals whose behavior put them at risk for developing HIV would have led to the detection of HIV in these individuals. We disagree and find that these surrogate tests could have predicted individuals who were at risk for developing HIV but could not have detected HIV in any individual. LSA-R.S. 9:2797 provides that a hospital will not be strictly liable for blood transfusions that result in the transmission of diseases which are undetectable by appropriate tests. The statute makes no mention of tests that could have possibly predicted the presence of a disease. Therefore, since the surrogate tests suggested by the plaintiffs would have possibly predicted the presence of HIV and would not have detected HIV, there can be no strict liability against Ochsner for their failure to use these tests.
We hold that the expert testimony presented in this case established that in January 1983, there were no tests available to detect HIV, making HIV "undetectable" as defined in the statute. Accordingly, LSA-R.S. 9:2797 is applicable and plaintiffs are barred by this statute from asserting claims of strict liability and breach of warranty of merchantability against Ochsner. We also note that the expert testimony indicates that in January 1983 there were no hospitals or blood banks that were using surrogate testing to predict which individuals were at risk for developing HIV.
For the foregoing reasons, the granting of the partial summary judgment in favor of Ochsner is affirmed.
AFFIRMED.
NOTES
[1] This same writ application also included the summary judgment and partial summary judgment which had been granted in favor of AABB and Dr. King. Plaintiffs were granted leave to file devolutive appeals against AABB and Dr. King. At that time plaintiffs did not seek leave to appeal the partial summary judgment which was granted in favor of Ochsner.
[2] Any confusion over whether an interlocutory order or partial summary judgment is appealable has been clarified by the amendments to Code of Civil Procedure Article 1915.